UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME HERRERA,<br><br>            Petitioner,<br><br>    v.<br><br>TERESA CISNEROS, Warden,<br><br>            Respondent. | No.  1:22-cv-00703-JLT-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[THIRTY DAY OBJECTION DEADLINE]** |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He presents three claims challenging his conviction in Kern County Superior Court.  As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.     PROCEDURAL HISTORY**

On August 24, 2017, a Kern County jury found Petitioner guilty of four counts of lewd or lascivious acts with a child under 14 years old (Cal. Penal Code § 288(a)) against three victims. (Doc. 14-1 at 264.[1])  On November 2, 2017, the court sentenced Petitioner to a term of 45 years to life.  (Doc. 14-1 at 264.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On December 17, 2020, the Fifth DCA affirmed the judgment.  People v. Herrera, No.

---

[1] Unless otherwise noted, references are to ECF pagination.

F076586, 2020 WL 7394364 (Cal. Ct. App. Dec. 17, 2020). Petitioner filed a petition for review in the California Supreme Court; the petition was denied on March 10, 2021. (Docs. 14-7, 8.)

On June 10, 2022, Petitioner filed the instant federal habeas petition. (Doc. 1.) Respondent filed an answer on September 15, 2022. (Doc. 15.) On October 14, 2022, Petitioner filed a traverse. (Doc. 16.)

## II.   FACTUAL BACKGROUND[2]

JD3 is Petitioner's wife's sister's daughter. At the time of trial, she was 20 years old. JD3 testified she used to see Petitioner often at family get togethers. JD3 testified to three incidents that occurred in her home in McFarland, California, when Petitioner was visiting her family.

The first incident of molestation to which JD3 testified occurred when she was in sixth or seventh grade. Petitioner came up behind JD3 while she was watching other children play computer games and grabbed her buttocks. On another occasion, when JD3 was in eighth grade, she was in her kitchen and bent to pick something up. Petitioner put his hand inside her bra and touched her breast. He told her he liked her "boobies." On another occasion around the same time, JD3 was walking toward her mother's bedroom, and Petitioner went after her and threw her on her mother's bed. Petitioner then lifted up JD3's shirt and put his mouth on her nipples. JD3 kneed Petitioner and ran to her bedroom. Petitioner attempted to try to get into her room but eventually left. By the time she turned 14 years old, she told her parents what had happened. JD2 and JD1 are siblings. Petitioner is their uncle on their father's side.

At the time of trial, JD2 was 16 years old. JD2 testified when she was nine years old, at her grandmother's house in Delano, California, she was in the living room watching television and Petitioner sat next to her and touched her thigh. The next thing JD2 knew, Petitioner's penis was in her mouth. Petitioner touched JD2 on her vagina and her breast. On another occasion in California around the same time, Petitioner had sexual intercourse with JD2 in the bedroom of his house.

---

[2] The facts are taken from the appellate court's Statement of Facts in its unpublished decision in People v. Herrera, 2020 WL 7394364, insofar as the Fifth DCA's summary of facts is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

At the time of trial, JD1 was 18 years old.  JD1 testified the first incident of sexual touching took place in Delano, California, in the living room of her grandmother's house before she was 13 years old.  She said when she was sitting on the couch, Petitioner lifted up her bra and touched her breast and put his mouth on it.

On another occasion when JD1 was in elementary school, JD1 was in the laundry room at her grandmother's house, and Petitioner came in, pulled down his pants, and told her to perform oral sex on him.  JD1 said no and believed Petitioner stopped attempting to get her to comply because his son went out in the yard near the laundry room.  During a forensic interview, which occurred in Nevada pursuant to a separate investigation for crimes committed there, JD1 told the interviewer that during this incident Petitioner also put his finger in her vagina and penetrated her anus with his penis.  At trial, JD1 had no independent recollection of Petitioner touching her in the laundry room on this occasion.

On another occasion at her grandmother's house when JD1 was about 10 years old, Petitioner pulled down JD1's pants and put his penis inside her.  On another occasion, she was playing a video game with Petitioner's son, who had special needs, and Petitioner came in and pulled down her pants and her underwear and started kissing and doing "other stuff" to her vagina while his son was playing the video game.  On another occasion in California, when JD1 was about 10 or 11 years old, she approached Petitioner to ask him something.  Petitioner told JD1 to turn around; he pulled her pants down and put his penis inside her.

When JD1 was in fifth or sixth grade, she told a friend about the sexual contact with Petitioner.  Eventually she told her mother what happened. It was reported to Nevada police in 2013.

All three victims testified to uncharged incidents of molestation which took place in Las Vegas, Nevada. JD3 testified that when she was about 10 years old, Petitioner put his hand inside JD3's shorts and rubbed her vagina when they were swimming together at his house in Las Vegas. JD1 testified Petitioner put his penis inside her on two occasions in Nevada when she was nine or 10 years old.  On another occasion when JD1 was approximately 11 years old, Petitioner grabbed JD1's foot, and rubbed it against his penis while they were sitting on the couch.  JD2 also

testified Petitioner penetrated her vagina with his penis in Las Vegas.

JD3 testified she knew JD2 and JD1 but did not talk to them often and had never talked to them about what happened with Petitioner. JD1 and JD2 said the same about JD3.

Mark Hoyt, a detective with the North Las Vegas Police Department Special Victims Unit, testified that in May 2013, a case involving JD1 and JD2 was assigned to him. Hoyt set up a forensic interview to be conducted at the Southern Nevada Children's Assessment Center (CAC) on June 11, 2013. Hoyt explained the CAC is "a safe place where children can go and be interviewed by a forensic interviewer" who specializes in sexual abuse. The CAC has forensic interviewers on staff to conduct the interviews. Kirsten DiNicola conducted the forensic interview with JD1. DiNicola is a certified forensic interviewer employed by the CAC. Hoyt testified, "By definition, a forensic interview through the national model is a legally sound and developmentally strategic way of obtaining information." It involves building rapport and obtaining information regarding any kind of physical, sexual abuse without asking a lot of leading questions. The interviewer tells the children to tell the truth and not guess or speculate and correct the interviewer if she gets something wrong. Forensic interviews were conducted of both JD1 and JD2. There are observation rooms where other investigators can observe the interview being conducted by the forensic interviewer. Hoyt observed JD1's interview in real time.

Clinical psychologist Michael Musacco, Ph.D., testified about the five stages of CSAAS, each consisting of a behavior that controverted an expectation of how a child victim of sexual abuse would behave. The first stage is secrecy where the child victim does not disclose the abuse right away. The second stage is helplessness where the child feels they cannot stop the abuse; an example of this is playing opossum during the act of being abused. The third stage is accommodation where the child resigns themselves to what is occurring and adapts to it in some way. This can occur in a number of ways and could include a child becoming depressed and suicidal or a child becoming a "perfect little adult[ ]" where they help with household responsibilities. The fourth stage is delayed or unconvincing disclosure where the child reports sometimes years later or into adulthood. The fifth stage is retraction, where the child takes back the account because of the aftermath the disclosure may have caused such as family rifts or Child

Protective Services or law enforcement involvement.

## III. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, ___ U.S. ___, ___ , 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. ___, ___, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)). Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3. Congress "meant" this standard to be "difficult to meet." Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### C. Review of Petition

Petitioner raises the following claims in his petition: 1) The trial court erred in admitting parts of JD1's forensic interview as a past recollection recorded exception to hearsay; 2) The erroneous admission of parts of JD1's forensic interview violated Petitioner's right to confront and cross-examine JD1; and 3) CALCRIM No. 1193 permitted the jury to consider expert testimony as evidence the complaining witnesses were telling the truth, and therefore, that the allegations were true, in violation of Petitioner's Fifth and Fourteenth Amendment Rights to due process.

#### 1. Admission of Forensic Interview

In his first claim for relief, Petitioner contends the trial court erred by permitting the prosecutor to read portions of a transcript of Petitioner's interview under the past recollection recorded exception to hearsay. Petitioner claims that the proper foundation was not laid pursuant to Cal. Evid. Code § 1237(a)(4) for admission of the excerpts. The claim was raised on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

**A. Relevant Background**

During JD1's testimony regarding the incident in the laundry room where appellant tried to get JD1 to perform oral sex on him, the prosecutor asked JD1 if she told DiNicola that "[appellant] put his finger in [her] in the laundry room[?]" JD1 responded that she did not remember. The prosecutor showed JD1 a transcript of her 2013 forensic interview to refresh her memory. JD1 reported the transcript helped to refresh her memory "a little bit." The prosecutor asked, "Now, when you were in the laundry room, do you remember if anything else happened?" JD1 responded she did not but she remembered that she was wearing an Elmo sweater during the incident. The following colloquy occurred:

"[PROSECUTOR:] ... [H]ave you ever seen ... a transcript of this interview prior to today?

"[JD1:] Not that I remember.
"[PROSECUTOR:] Have you listened to a recording of an interview that you gave to [DiNicola] in Las Vegas at the children's center?

7

> "[JD1:] Not that I remember.
>
> "[PROSECUTOR:] Let me ask you, what you just read, do you recall having that conversation with her?
>
> "[JD1:] Yes.
>
> "[PROSECUTOR:] And do you recall making those statements?
>
> "[JD1:] Yes [¶] ... [¶]
>
> "[PROSECUTOR:] ... I gave you ... Page 24 ... 25, and 26 [with regard to the laundry room incident]. And those pages was that an accurate, I guess, transcription of what you said in that interview?
>
> "[JD1:] Yes.
>
> "[PROSECUTOR:] At the time that you did the interview when you were 13, were the events of what happened in the laundry room in Delano more fresh in your memory?
>
> "[JD1:] Yes."

The prosecutor then moved to admit the prior statement as a past recollection recorded. The court asked defense counsel if he needed a side bar. Defense counsel responded in the affirmative at which point an unreported sidebar conference was held. When the court was back on the record, the court asked defense counsel if he had an objection. Defense counsel responded, "I do, Your Honor." The court overruled the objection and stated, "We'll make a record on it later. You [prosecutor] may read. And let's do it question, answer." No record was ever made of the specific ground of defense counsel's objection.

Defense counsel stipulated to the prosecutor reading the transcript rather than having JD1 read it. In the portion of the transcript read, JD1 told DiNicola that along with attempting to get her to suck his penis, appellant "started penetrating [her], putting his finger in [her]."

After reading this portion of the transcript, the prosecutor asked, "is that accurate of what you said to [DiNicola]?" JD1 responded, "Yes." The prosecutor asked JD1 if she recalled appellant putting his finger in her body, and JD1 responded, "In the laundry room, I don't remember."

The prosecutor then asked JD1 if she recalled whether appellant turned her around and "did something to [her]." JD1 said no. JD1 said her memory would be refreshed by reviewing the transcript. After reviewing the transcript, JD1 said it did not refresh her memory as to anything else that happened in the laundry room. The following colloquy occurred:

> "[PROSECUTOR:] Were you truthful when you gave this statement to [DiNicola] in Las Vegas?
>
> "[JD1:] Yes.
>
> "[PROSECUTOR:] And she explained to you the need to tell the truth when you started your interview. Do you recall that?

8

"[JD1:] Yes.

"[PROSECUTOR:] And were you honest with her?

"[JD1:] Yes.

"[PROSECUTOR:] And is this an accurate copy of the words that you said to her?

"[JD1:] Yes."

The prosecutor requested to read the rest of the statement via a stipulation from counsel that he can read it and pursuant to past recollection recorded. The court responded, "Before the stipulation, are you objecting to him reading that, [defense counsel]?" Defense counsel replied, "No, Your Honor." The court asked if he stipulated whether the prosecutor could read rather than ask the witness, and defense counsel responded in the affirmative.

The prosecutor then read a portion of the interview where JD1 told the forensic interviewer that appellant put his penis in her anus during that incident in the laundry room.

The prosecutor asked JD1 if she remembered appellant physically touching her body anywhere during the time in the laundry room based on her independent memory and JD1 replied in the negative.

**B. Past Recollection Recorded**

The hearsay exception commonly referred to as past recollection recorded is set forth in Evidence Code section 1237, which reads as follows:

> "(a) Evidence of a statement previously made by a witness is not made Inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:
>
> "(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;
>
> "(2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;
>
> "(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and
>
> "(4) Is offered after the writing is authenticated as an accurate record of the statement." (§ 1237, subd. (a)(1)-(4).)

**C. Analysis**

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) "

9

'[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Appellant's only challenge to admission of the transcript excerpts is that proper foundation was not laid pursuant to section 1237, subdivision (a)(4). He points out DiNicola did not testify. He also contends JD1 could not have authenticated the transcript as accurate because she did not prepare the transcript and, as she did not remember the laundry room incident, she was incompetent to testify the transcript was accurate. Appellant contends that without JD1's sufficient recall of the events, "the [trial] court was without a sufficient basis to conclude that the transcription was reliable."

As a threshold matter, we note that though appellant stated he had an objection following a side bar with the court before the prosecutor was permitted to read the transcript excerpts, we have no record of the side bar, and no grounds for objection were stated on the record. For these reasons, and because no settled statement describing the contents of the side bar have been submitted to us, we are unable to determine whether the court was able to make an informed ruling on the foundation pursuant to section 1237, subdivision (a)(4). (*People v. Jackson* (2016) 1 Cal.5th 269, 367.) " 'A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal.' " (*Ibid.*; see *People v. Cowan* (2010) 50 Cal.4th 401, 465-466 (*Cowan*) [where a defendant objected to admission pursuant to § 1237, subd. (a)(3) below, argument regarding § 1237, subd. (a)(1) forfeited].) Further, appellant clearly declined to object to the second excerpt being admitted. For these reasons, we find the issue is forfeited. In any event, however, appellant's claim fails on the merits. We conclude the trial court did not abuse its discretion by admitting the excerpts read from the transcript of JD1's forensic interview.

For authentication of a document, the prosecution is only required to lay a "prima facie case" the writing is accurate. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 267–268.) " 'Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.' " (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1172, fn. 14.)

Here, JD1 testified she remembered making the statements in the transcript excerpts and the excerpts were an accurate transcription of what she said. We conclude this is enough for a prima facie case for accuracy. We disagree with appellant's contention that the transcriptionist was required to testify in order to lay the proper foundation under section 1237, subdivision (a)(4). A party to a recorded conversation may testify to the accuracy of a transcript. (*People v. Sigal* (1963) 221 Cal.App.2d 684, 704.) In *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1064-1065, the appellate court noted sufficient foundation for accuracy of a transcript of an interview was laid pursuant to section 1237 when the declarant testified she believed the transcript was accurate and that " 'I have no reason to say why they wouldn't report it the way it was ... I don't remember the conversation, so this is all I have to go on. Yes. I believe it's accurate.' " (*Seibert v. City of San Jose*, at p. 1065, italics omitted.) Here, the testimony of JD1 goes farther in that she testified she did remember making the statements and the transcript was accurate. Though we appreciate appellant's argument, we also acknowledge the trial court likely made a reasonable reconciliation of JD1's statements that she did not remember the details of the event in the laundry room but did remember making the statements to DiNicola enough to opine the transcript was accurate.

We note " '[t]he fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*People v. Goldsmith, supra*, 59

10

>Cal.4th at p. 267.) Here, the defense made no attempt to affect the jury's assessment of the weight of the evidence despite having the opportunity. The defense did not cross-examine JD1 on her testimony of the transcript's accuracy. The defense did not question Hoyt, the prosecution's designated investigating officer who observed the interview in real time, and who was present in court for JD1's testimony on the transcript's accuracy. There is no evidence the transcript contained errors of the magnitude such that JD1 did not describe the acts of penetration referred to in the excerpts. To the contrary, the record demonstrates the transcript was in the possession of the defense and was prepared from a recording the defense likely had in its possession or at the very least had access to. We conclude this from the defense's own trial brief wherein defense counsel referred to the forensic interview explicitly, stated the interview was recorded, and described the contents of the interview in its recitation of the facts of the case, including the details of the laundry room incident. The defense clearly anticipated JD1 and JD2 would be testifying to the same events described in the interview. The defense could reasonably expect the transcript be used to refresh JD1's and JD2's memories and to possibly assist the defense in impeaching the witnesses if they were to give testimony inconsistent with what they said in their interviews. For these reasons, the accuracy of the transcript was important, and had there been concerns about the accuracy of the transcription, it appears the defense could have independently compared the transcript to the recording to confirm its accuracy. Based on this record, had there been serious errors in the transcription, the defense would have known and could have revealed them before trial, or at least during trial to affect the weight of the excerpts' effect on the jury's considerations.
>
>Finding appellant forfeited the issue by not making a record of the grounds of his objection, and in any event, that the trial court did not abuse its discretion in implicitly finding the proper foundation had been laid, and considering the defense made no attempts to undermine the authenticity despite its opportunity to do so, we find no reversible error.

Herrera, 2020 WL 7394364, at *3-6.

   a.  Procedural Default

The state court found that Petitioner had forfeited his claim by failing to state the basis of his objection when the prosecutor asked to admit the excerpts. A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If an

issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

The Ninth Circuit has repeatedly held that California's contemporaneous objection doctrine is clear, well-established, has been consistently applied, and is an adequate and independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d 953 (9th Cir. 1999). Thus, by failing to object to the admission of the excerpts, Petitioner waived his claim in state court and is procedurally barred from raising it here. In addition, as discussed below, the claim fails to state a federal claim.

### b. Failure to State a Claim

This claim is not cognizable on federal habeas review. 28 U.S.C. § 2254(a) provides that "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States*." (emphasis added.) The claim is entirely premised on a violation of state law, and the admissibility of evidence is a matter of state law. Petitioner makes no mention of a violation of the Constitution or Federal law. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). Therefore, the claim must be dismissed.

### 2. Admission of Transcript in Violation of Confrontation Clause

Petitioner next alleges that his Sixth Amendment rights to confront and cross-examine witness JD1 were violated by the admission of the transcript. He claims he was unable to cross-examine JD1 about an incident she did not recall. Petitioner raised this claim on direct review as well. Relying on the California Supreme Court case People v. Cowan, 50 Cal.4th 401 (2010, the Fifth DCA rejected the claim as follows:

12

> In [*People v.*] *Cowan* [(2010) 50 Cal.4th 401, 465-466], the California Supreme Court held there is no Sixth Amendment violation when a witness's statement of which he has no recollection is admitted pursuant to section 1237, and the defense has the opportunity to cross-examine the witness about the statement. (*Cowan, supra*, 50 Cal.4th at p. 468.)
>
> We reject appellant's argument in light of our Supreme Court's decision in *Cowan*.

Herrera, 2020 WL 7394364, at *6.

### a. Legal Standard and Analysis

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., Amend. VI. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004); Davis v. Washington, 547 U.S. 813, 821 (2006). The Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'" Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24. "'Testimony,' in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at 824.

However, the Supreme Court has not held that the Confrontation Clause is implicated when the witness testifies. Crawford, 541 U.S. at 53-54. In addition, the Supreme Court has held that "[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Delaware v. Fensterer, 474 U.S. 15, 21-22 (1985). In California v. Green, the Supreme Court further held that "the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be

13

asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories." 399 U.S. 149, 164 (1970).

In this case, JD1 testified. (Doc. 14-2 at 329-405.) Although she did not remember some of the instances set forth in her prior statements, she testified she remembered making the statements in the transcript excerpts and the excerpts were an accurate transcription of what she had said. (Doc. 14-2 at 342-343, 347-349.) In addition, defense counsel thoroughly cross-examined her concerning her recollection of events. (Doc. 14-2 at 406-434, 477-507, 524-527.) Thus, Petitioner fails to demonstrate that his rights under the Confrontation Clause were violated. He has not shown that the state court rejection of the claim was contrary to or an unreasonable application of Supreme Court precedent. The claim should be denied.

        3.        Admission of Transcript in Violation of Confrontation Clause

In his final claim, Petitioner alleges that CALCRIM No. 1193 lowered the jury's burden of proof by permitting the jury to consider expert testimony as evidence the complaining witnesses were telling the truth. Petitioner also raised this claim on direct review. The Fifth DCA rejected the claim as follows:

> Before Musacco's testimony, the court instructed the jury with CALCRIM No. 1193: "You may hear testimony from [Musacco] regarding [CSAAS]. [¶] Testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not an alleged victim of abuse ... was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." The same instruction was given at the close of evidence.
>
> Appellant contends by failing to instruct the jury that the testimony could not be used to determine if the allegations are true, the jury was permitted to find appellant guilty by a lesser standard than beyond a reasonable doubt. Appellant contends this failure violated his Fifth and Fourteenth Amendment rights to due process.
>
> Although appellant failed to object to the instruction below, we will address the claim since "'the issue raised asserts a violation of substantial constitutional rights.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) In any event, appellant's claim fails.
>
> "'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, "'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.'"'" (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) "We look to the instructions as a

14

whole and the entire record of the trial, including the arguments of counsel." (*People v. Lopez, supra*, 198 Cal.App.4th at p. 708.) We also presume the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

We do not find the trial court's failure to use the specific words that "[CSAAS] evidence cannot be used to determine whether the molest[ation] claim[s] [were] true" lowered the prosecution's burden of proof or meant that the jury would have disregarded the beyond the reasonable doubt standard. We conclude the totality of the court's instructions and the rest of the record did not permit the jury to impermissibly use the CSAAS evidence to consider whether the victims' molestation claims were true. Accordingly, we reject appellant's claim that any of his constitutional rights were violated.

First, CALCRIM No. 1193 expressly prohibits the jury from using the CSAAS evidence to determine whether the defendant is guilty. We reject appellant's argument that "[t]he difference between using evidence to establish the complaining witnesses' credibility but not to establish [appellant's] guilt is a fine line virtually incapable of distinction." Rather, we conclude the only reasonable interpretation of the instruction as a whole is that jurors may use the evidence to evaluate the believability of the witnesses' claims in light of the evidence that they engaged in conduct seemingly inconsistent with the conduct of a child who had been molested after the molestations allegedly occurred. This is a permissible use of CSAAS evidence. As the California Supreme Court has recognized, while CSAAS evidence is not admissible to prove the complaining witness has in fact been sexually abused, it "is admissible to rehabilitate [the child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) The instruction tells jurors they should not necessarily discount complaining witnesses' testimony just because they exhibit behaviors described by CSAAS. CALCRIM No. 1193 does not mislead the jury into using CSAAS evidence for the impermissible purpose of determining that, because a witness exhibits the stages of CSAAS evidence, the molestation claims are true.

Further, there was ample testimony from Musacco underlining the proper way to use the CSAAS evidence. Musacco explained the "syndrome" is better described as a "theory" and that it is not used to prove or disprove whether or not somebody has been abused. He said:

> "[T]here has been some misuses with this syndrome, and I always want to make it clear that I have no information about the defendant. I have no information about the alleged victim or victims. I'm not saying that they were actually abused. I'm not saying that the defendant was a perpetrator. This is generic to testimony that is used to describe the behavior of children who have been abused. But ... I can't say because of this, then this child has been abused or this alleged perpetrator is guilty. [¶] That would be an absolute misuse of the syndrome, and I always try to make sure that I'm clear on that issue."

The prosecutor further clarified Musacco's comments by asking whether the syndrome is meant to dispel misnomers about how a child would react if they were abused. Musacco responded that was correct and "the syndrome was developed using ... children who had actually been abused. But we can't go from those children who were abused and then take that information to say that the children here that we're talking about were definitely abused. We can't make that

inference." On cross-examination Musacco again underscored that "people have unfairly used the syndrome to make it seem like a particular person is guilty, a particular person has been specifically abused. And that is a misuse of the syndrome."

The prosecutor further precluded any possible confusion on this front. He argued "Dr. Michael Musacco. Now, there's an instruction, and you should apply this testimony appropriately. It is not evidence of the defendant's guilt, [CSAAS]. And the reason is because when Dr. Musacco testifies the syndrome presumes that somebody was molested. So that's not what this case is about. I have to prove the charges beyond a reasonable doubt. The importance of this is if you have got some insight into a child and how a child perceives the world and how a child in certain studies in the field of psychology reacts to trauma and sexual abuse."

Finally, other instructions given to the jury precluded an impermissible use of the CSAAS evidence. The jury was instructed the People had to prove the case beyond a reasonable doubt. (CALCRIM No. 220.) They were also instructed they must judge the credibility or believability of the witnesses, using common sense and experience. (CALCRIM No. 226.) They were given several factors by which to evaluate the witnesses' credibility including: how well the witness was able to remember and describe what happened, their behavior while testifying, any potential influence by a personal relationship with someone involved in the case, how reasonable the testimony is in consideration with all other evidence, and whether the witness has engaged in other conduct that reflects on their believability. (CALCRIM No. 226.) The jurors were also instructed that before they conclude the testimony of one witness proves a fact, they should carefully review all the evidence. (CALCRIM No. 301.) The jurors were instructed that when certain evidence was admitted for a limited purpose, they must consider the evidence only for that purpose and for no other. (CALCRIM No. 303.) They were also instructed they could disregard any expert opinion they find unbelievable, unreasonable, or unsupported by the evidence. (CALCRIM No. 332.)

For the foregoing reasons, we conclude it is not reasonably likely the jury applied the instruction in the impermissible manner appellant claims. We find no instructional error and accordingly no violation of any of appellant's constitutional rights.

Herrera, 2020 WL 7394364, at *6-8.

### a. Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Id. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (*per curiam*) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

### b. Analysis

The Ninth Circuit and district courts have repeatedly rejected claims that expert testimony on Child Sexual Abuse Accommodation Syndrome ("CSAAS") or similar areas of expertise improperly infringe on the province of the jury to assess the credibility of an alleged sexual abuse victim. See Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003) (rejecting a habeas petitioner's due process argument that CSAAS testimony improperly bolstered the credibility of child witnesses) (citing United States v. Bighead, 128 F.3d 1329, 1330-31 (9th Cir. 1997) (*per curiam*); and United States v. Antone, 981 F.2d 1059, 1062 (9th Cir. 1992)); Griffin v. Martinez, 2021 WL 4100000 (E.D. Cal. 2021) (rejecting the claim that CALCRIM No. 1193 allowed the jury to use CSAAS evidence for the impermissible purpose of determining the molestations occurred or that the molestation claims were true); Darbouze v. Kibler, 2021 WL 6618675 (C.D. Cal. 2021) (rejecting the petitioner's claim that the jury applied CALCRIM No. 1193 in a way that lowered the prosecution's burden of proof); Fortin v. Ndoh, 2019 WL 4018356 (C.D. Cal. 2019) (rejecting

argument that CALCRIM No. 1193 bolstered credibility of the complaining witnesses).  Such expert evidence is not fundamentally unfair because it "is not used to opine that a specific child is telling the truth," but rather it merely assists the jury in assessing the evidence. See Brodit, 350 F.3d at 991; see also Antone, 981 F.2d 1062 (finding that expert testimony "merely assisted the trier of fact in understanding the evidence; it did not improperly bolster the particular testimony of the child victim in this case.").

In this case, the court instructed the jury that the expert's CSAAS testimony was "not evidence that the defendant committed any of the crimes charged against him." (Doc. 14-1 at 237.) The jury was further instructed that it could consider the evidence "only in deciding whether or not an alleged victim of abuse's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (Doc. 14-1 at 237.)   Here, CALCRIM No. 1193 did not affirmatively bolster the credibility of the complaining witnesses, but rather permitted the jury to assess their testimony with the assistance of an expert opinion about circumstances of child sexual abuse that may be commonly misunderstood.

The state court rejection was entirely consistent with state court law, and Petitioner fails to demonstrate that the determination violated federal law or was contrary to, or an unreasonable application of, Supreme Court authority.  The claim should be denied.

## IV.     RECOMMENDATION

Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if

served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **November 23, 2022**          /s/ *Sheila K. Oberto*
                                      UNITED STATES MAGISTRATE JUDGE